# IN THE COURT OF APPEALS OF IOWA

————————

No. 25-1617
Filed July 8, 2026

————————

**In re the Marriage of Laurie M. McCormick and Amy S. Rein**

Upon the Petition of
**Laurie M. McCormick,**
Petitioner–Appellee,

And Concerning
**Amy S. Rein,**
Respondent–Appellant.

————————

Appeal from the Iowa District Court for Johnson County,
The Honorable Lars G. Anderson, Judge.

————————

**AFFIRMED**

————————

Alexander S. Momany (argued) of Howes Law Firm, P.C., Cedar Rapids,
attorney for appellant.

Rae M. Kinkead (argued) of Simmons Perrine PLC, Cedar Rapids, attorney
for appellee.

————————

Heard at oral argument
by Tabor, C.J., and Chicchelly and Sandy, JJ.
Opinion by Tabor, C.J.

1

**TABOR, Chief Judge.**

Amy Rein appeals the division of property in the decree dissolving her marriage to Laurie McCormick. Amy argues that it was inequitable for the district court to (1) order her to make an equalization payment of $277,562.93 to Laurie and (2) award her retirement assets to Laurie. Because the district court's division of the couple's assets was equitable, we affirm.

## I.     Facts and Prior Proceedings

At the time of trial, Laurie was fifty-four years old and Amy was sixty years old. They married in 2018 and divorced in 2025.

Laurie graduated from medical school in 1998. She completed a fellowship at the University of Iowa and worked as a faculty member for ten years, ending in 2013. She then moved to St. Thomas, U.S. Virgin Islands, where she worked at a hospital for a year and started a psychiatric practice, Integrated Health and Behavioral Specialists. That same year, she bought a home there. Laurie was previously married and makes payments to her ex-spouse to settle a quitclaim deed to the St. Thomas home, as well as monthly payments for child support. Combined, Laurie brought about $259,699 of debt into the marriage.

Amy earned a doctorate in clinical psychology. Before her marriage to Laurie, she lived in Canada. In 2008, she sought a bridge loan of $536,655 from her friend, Cam Zabel. Amy filed for bankruptcy in 2011. Despite discharging her debt to Cam in bankruptcy, Amy testified that she felt "a very strong moral obligation to pay him back."

Laurie and Amy met in 2016 through an online dating service. Amy had recently moved from Canada to Florida, where she ran various psychology clinics, including the Rein Center in Coral Gables. But shortly

after meeting Laurie, Amy closed her Florida practice and moved to St. Thomas. Early in their relationship, Laurie added Amy to her business as a fifty percent owner. After a hurricane hit St. Thomas in 2017, the couple moved to Iowa City, where Laurie bought a house. For a few months, Amy was unemployed, and Laurie paid her $10,000 each month. At the same time, Laurie was winding down Integrated Health and Behavioral Specialists.[1] Laurie also worked at the VA Hospital for about one year, which allowed the couple to afford office space for a new business, also named the Rein Center.[2]

They co-founded the Rein Center at the end of 2017 and began operating it in early 2018, just after they married. Laurie testified she provided capital to help start the Rein Center. And she went into the office every day—providing care, hiring other providers, and serving as the medical director. In 2020, the couple sold their Iowa City house and moved to Solon. The Solon home was on a farm that included an apple orchard and vineyard. They sold apples to Wilson's Orchard for around $1,000 a year. As for their St. Thomas home, they used insurance proceeds and marital funds to repair it. Amy turned it into an Airbnb and rented it out, but it operated at a loss.

Managing the finances in their marriage rested with Amy. Laurie testified, "I trusted her completely to take over all of my finances." During their marriage, Laurie did not contribute to her retirement account. Instead, she relied on Amy's statement that if they divorced, Laurie would get half of Amy's retirement assets. According to Laurie's testimony, after Amy paid various home expenses, "there was no money left for me to put into savings or my own retirement. It was all used. I didn't have anything left."

---

[1] She closed that business in 2023.

[2] The business is legally named Dr. Amy S. Rein & Associates, PLLC.

During the marriage, Amy made regular payments to Cam for the discharged debt. Laurie admitted at trial she knew about the debt and Amy's intention to repay it. But she testified that she did not know Amy was sending payments to Cam, nor the amounts.

In 2023, the couple separated. In July, Amy terminated Laurie's employment with the Rein Center. Laurie temporarily moved into a trailer home and now lives in a rental property in Cedar Rapids. After they separated, Laurie started her own business, Holistic Wellness. She described it as functioning like the Rein Center. It employed several providers, but only one was full-time because there were not enough patients yet. That new business opened about eighteen months before the dissolution trial.

Property division was the primary issue in the divorce proceedings. Although they agreed that the court should award the Rein Center to Amy and Holistic Wellness to Laurie, they disagreed on the value of each business. They also disagreed on the value of the St. Thomas house and who should get the Solon home. Based on the proposed divisions, Laurie requested a property equalization payment. Amy opposed the payment.

In July 2025, the court issued the decree. The court found Holistic Wellness had "essentially no value." The court acknowledged that it "may have value in the future," but "as of trial it generates income comparable to or less than what Laurie could earn in the private sector." By contrast, the court found that the Rein Center was worth $1,000,000—which fell between the values offered by the parties' two experts.

The court valued the Solon home at $1,250,000 and awarded it to Amy. It valued the St. Thomas home at $1,115,000 and awarded it to Laurie. It distributed the rest of the assets between Amy and Laurie, notably

assigning all of Amy's retirement assets to Laurie. After dividing the property, the court ordered Amy to pay Laurie an equalization payment of $277,562.93. The court did not order spousal support for either party.

Amy appeals.

## II.    Scope and Standard of Review

Dissolution-of-marriage proceedings are tried in equity, so we review de novo. *In re Marriage of Kimbro*, 826 N.W.2d 696, 698 (Iowa 2013). We defer to the district court's factual findings, but these findings are not binding on us. *Id.* We disturb the district court's ruling only "when there has been a failure to do equity." *Id.* (quoting *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005)).

## III.    Analysis

Amy raises two issues on appeal. First, she challenges the $277,562.93 property equalization payment. Second, she contends the district court erred by awarding her retirement assets to Laurie.

### A. Property Equalization Payment

Subsumed in this first argument are three subparts. (1) Did the district court accurately value their business interests? (2) Did the court properly count Amy's debt to Cam Zabel as an asset for Amy? And (3) Should the court have assessed the St. Thomas property as income-generating property?

Iowa courts must divide marital property equitably. *In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007). "An equitable division is not necessarily an equal division." *Id.* An equitable division depends on the parties' circumstances. *Schriner*, 695 N.W.2d at 496. But we generally recognize that an equal split achieves equity. *Kimbro*, 826 N.W.2d at 703. In

deciding what is equitable, we consider the factors in Iowa Code section 598.21(1) (2023). *See Hansen*, 733 N.W.2d at 702.

Before dividing marital property, the district court must identify and value all assets subject to division and all debts owed by either or both parties. *In re Marriage of Keener*, 728 N.W.2d 188, 193 (Iowa 2007). "[A]ssets should . . . be given their value as of the date of trial." *Id.*

First off, we address whether an equal split is equitable here. Advocating against an exact balance, Amy emphasizes the short duration of their marriage—five years until separation and seven and a half years until dissolution. Amy also highlights the nature of the assets and that she walked away with more liabilities. True, Amy was left with more debt, but she also retained valuable assets. As to the length of the marriage, we agree an equal division is not always equitable in short-term marriages. *In re Marriage of Hansen*, 886 N.W.2d 868, 873 (Iowa Ct. App. 2016). But here, Amy entered the marriage with few assets after filing for bankruptcy in Canada and closing her practices in Florida. *See* Iowa Code § 598.21(5)(b). She moved in with Laurie, relied on her while unemployed, and used Laurie's capital investment to help start the Rein Center. Laurie also contributed to Amy's earning potential by investing her services into the Rein Center, and she relied on Amy to handle financial decisions. *See id.* § 598.21(5)(e). Their economic endeavors were intertwined. Thus, it would be inequitable to permit Amy to leave the marriage with a greater share of the assets than Laurie. Having determined an equal split is equitable, we move to Amy's arguments on specific assets and liabilities.

## 1. Business Valuation

We begin with their respective businesses. Amy contends the Rein Center and Holistic Wellness are worth the same amount, so no equalization payment was necessary. Alternatively, she asks us to remand for revaluation.

To reach an equitable division of the marital estate, the district court was called to value the parties' businesses. *Keener*, 728 N.W.2d at 193. Valuing closely held businesses is difficult, so "appellate courts give much leeway to the trial court." *Id.* at 194. If the court's valuation is "within the range of evidence," then we do not disturb it. *Id.* "[A]ppellate courts defer to a trial court's valuations when accompanied by supporting credibility findings or corroborating evidence." *Id.* As for the goodwill factor, it can be considered for the purposes of setting alimony. *In re Marriage of Ceilly*, No. 02-0434, 2003 WL 555607, at *2 (Iowa Ct. App. Feb. 28, 2003). But because goodwill bears on future earning potential, it is not considered in valuation for property division taking place at the time of trial. *In re Marriage of Bethke*, 484 N.W.2d 604, 607 (Iowa Ct. App. 1992).

*The Rein Center.* The parties presented competing experts to value this business. Laurie retained Brian Crotty, who used an income-based approach—"a simple average of the last three years of operations"—and found the business was worth $1,526,940.[3] Crotty took the net income of the business each year, set aside Amy's salary, and used the remaining income to

---

[3] In his report, Crotty explains, "the value of a company is the present value of future benefits (usually earnings, cash flows, or distributions) that accrue to the shareholders." Crotty wrote, "In valuing [t]he Rein Center, I relied upon the capitalization of earnings method utilizing a simple average of fiscal years 2022, 2023, and 2024 revenue and EBITDA [earnings before interest, taxes, depreciation, and amortization] to compute a normalized level of earnings an owner could expect to receive in the future."

calculate the business's worth. For Amy's salary, Crotty used $153,385, roughly what she paid herself for the last few years before trial and a salary comparable to similar jobs in the same industry. Crotty did not discount for any personal goodwill, nor did he consider projected operations for 2025.

On the other side, Amy retained Jennifer Julander, who relied on 2025 projections to value the business at $614,000. Julander included a twenty percent deduction for goodwill. What's more, her valuation did not reflect rising reimbursement rates from insurance.

The district court considered the differences between the experts' valuations and concluded that the Rein Center was worth $1,000,000. Amy's chief concerns with that valuation are: (1) insurance reimbursements were subject to unpredictable delays, (2) Amy relied on loans to maintain the practice, and (3) Laurie's expert did not consider goodwill in his valuation.

The district court's valuation is within the range of reliable evidence. Crotty used a three-year average, which resolves any delays with insurance reimbursement. This three-year span included time that Laurie was not working there, so the valuation accounts for any loss of income caused by her departure. As to Amy's reliance on loans, the court noted that the parties "agreed to treat [business-related assets and liabilities] separately from the businesses themselves." Lastly, the court recognized that while much of the income for the Rein Center is from employed providers, "the business has name recognition associated with Amy." It found "something in between" zero and twenty percent deduction for goodwill was appropriate. The district court properly weighed the evidence presented to reach the $1,000,000 valuation. So, we affirm the district court's valuation of the Rein Center.

*Holistic Wellness.* Only Laurie offered expert testimony on the value of her new business venture. As well as valuing the Rein Center, Crotty testified about the worth of Holistic Wellness. He explained that when he considered the salaries of Laurie and Amy and applied the same valuation method, Holistic Wellness would have no stand-alone worth. Laurie's business generated a net income of about $147,000. With that figure in mind, Crotty testified,

> I don't know that [Holistic Wellness is] worth anything at this point. Again, if we made a similar adjustment for compensation to pay Dr. McCormick's salary like we did for Dr. Rein, there would be zero income left, essentially. So regardless of what you wanted to argue the multiple might be, if you don't have any extra income to apply that multiple, you've got a—in theory a zero value for the business today.

Amy valued the company differently. She didn't present an expert but relied on her familiarity with business operations and Holistic Wellness accounting documents to project future income. She valued the company at $600,000. She testified about her approach:

> I went through Laurie's current website and I went to look at "book an appointment" and then I looked at each provider that she had available on her current schedule. And I looked a few weeks in advance to see what their availability was. And then based on that I made this table that shows, as best as I could tell from the schedule, how many hours a week they had available, total availability for patients, what their billing rate was as per [the insurer] and projected yearly revenues based on that information.

The district court was unpersuaded by Amy's view. Instead, it accepted Crotty's opinion that Holistic Wellness's net income of $147,000 in 2024 essentially replaced Laurie's salary. And after setting aside that amount, there was no revenue leftover for the business itself. Considering that the company's income matched what Laurie could earn in the private sector, and considering Holistic Wellness has struggled to maintain income-

generating providers, the court found "that Holistic Wellness ha[d] essentially no value" at the time of the dissolution trial.

Amy argues on appeal the company "was a profitable, ongoing enterprise at the time of trial with significant growth potential beyond its established significant value." She pointed to Holistic Wellness's "enterprise infrastructure, including staffing, marketing, and administrative systems, beyond [Laurie's] individual labor" to show the company's "substantial intrinsic, actual value [is] comparable to, if not exceeding, that of [t]he Rein Center."

We reject Amy's valuation because it relies on future potential growth. *See Keener*, 728 N.W.2d at 193. True, Holistic Wellness exists beyond Laurie's individual labor; but no profit remains after accounting for her salary. *See In re Marriage of Jackson*, No. 10-1366, 2011 WL 3925703, at *2–3 (Iowa Ct. App. Sept 8, 2011) (noting we use salary to calculate spousal support awards but not to calculate business value). No doubt Amy is business-savvy. But her calculation was limited to reviewing the Holistic Wellness website. So the district court was faced with balancing Amy's speculative valuation with an expert's opinion. The court's determination that Holistic Wellness had zero value was within the range of evidence presented. We decline to disturb it.

The district court appropriately valued each business.

### 2. Debt to Cam Zabel

Next, Amy contends "the district court inaccurately attributed debt to Cam Zabel as an asset" on her side of the ledger. In doing so, the district court noted that "[e]ach party's proposed distribution, as well as the signed Stipulation of Assets and Liabilities, filed April 15, 2025, include the $294,128.77 as an asset of Amy's."

Amy asks that we find either (1) that her payment of debt to Cam is not an asset that should be assigned to her or (2) her debt is roughly the same as debts Laurie brought into the marriage. The framing of this issue is unusual. The question is not whether Laurie should be responsible for the debt to Cam. *See In re Marriage of Sullins*, 715 N.W.2d 242, 251 (Iowa 2006) ("Debts of the parties normally become debts of the marriage, for which either party may be required to assume the responsibility to pay."). Rather, at oral argument, Amy's counsel suggested that the district court had improperly treated her payment of the debt as dissipation of marital assets.[4]

At trial, neither party characterized Amy's payments to Cam as dissipation. Nor did the court do so in the decree. And the parties do not invoke the dissipation doctrine in their appellate briefs. Still, the doctrine provides a helpful analogy in deciding how to classify Amy's payments toward the discharged debt. As Laurie asserts on appeal, she was in the dark about the couple's finances. And Amy made the unilateral decision to keep making sizeable payments to Cam.[5] Laurie testified that she knew Amy wanted to repay the debt but did not know the amount or the manner of payments until the dissolution proceedings.

---

[4] "A court may generally consider a spouse's dissipation or waste of marital assets prior to dissolution when making a property distribution." *Kimbro*, 826 N.W.2d at 700. Most often, the "dissipation doctrine" applies to a spouse's conduct during the time of separation. *Id*. at 700–01. But we have found a party liable for joint assets dissipated during the marriage when the waste occurred without the other party's knowledge or consent. *See In re Mariage of Leininger*, No. 08-650, 2009 WL 606233, at *1 (Iowa Ct. App. Mar. 11, 2009).

[5] Amy testified that "what [she] paid to Cam is kind of part of the whole marital soup."

Under these circumstances, we believe the district court acted equitably in counting the $294,128.77 in payments to Cam as an asset belonging to Amy. *See Leininger*, 2009 WL 606233, at *2. Because the district court relied on the parties' stipulations and ensured the overall property distribution was equitable, we find no fault in its assignment of this disputed asset to Amy.

As to the debts Laurie brought into the marriage, we do not see them in the same light. Laurie's debts were legal obligations—not moral compulsions—of which Amy was fully aware.

### 3. St. Thomas Property

During their marriage, the couple used their St. Thomas property as a vacation rental. Laurie testified the house generates about $100,000 to $120,000 a year in income. The district court valued the property at its appraised value of $1,115,000. But to account for the income generated by the property, Amy asks us to find the house "represents an additional financial value of $120,000 attributable to Laurie."

Laurie contends that Amy failed to preserve this argument for appeal. We agree. In her proposed relief, Amy proposed that Laurie receive the St. Thomas property but did not mention income generation. In fact, at trial, Amy testified that during the five years she ran the Airbnb, there was a net loss of about $73,000. On this record, the district court appropriately relied on fair market value.[6]

---

[6] In any event, the income-generating nature of the property would be considered for spousal support purposes, not for property division. *See In re Marriage of Barten & Bigelow*, No. 22-0084, 2023 WL 2395324, at *6 n.9 (Iowa Ct. App. Mar. 8, 2023) (valuing apartment complex without considering rental income).

## B. Retirement Assets

The district court awarded three retirement accounts held in Amy's name to Laurie. Amy argues this was inequitable. In Amy's estimation, the district court "could and should have simply considered those values for assessment as part of the amount owed to Laurie as an equalization payment, not divest[ed] her of her retirement at this stage in her life and career." Amy emphasizes that Laurie was not fiscally responsible, did not contribute to her own retirement savings, and has a higher earning potential. Further, Amy insists that "[her] retirement contributions were made from [her own] earnings, not through joint planning or joint contributions."

We treat retirement accounts and pensions as marital assets subject to division. *In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996). It follows that we must strive to achieve equity in dividing such property. *Hansen*, 733 N.W.2d at 702.

Granted, if we viewed the retirement assets in isolation, it would defy equity to award them all to Laurie. But "[w]hen similar retirement security is provided for both parties through the overall scheme of an equitable property division, an equal division of retirement benefits is not required." *In re Marriage of Bruns*, No. 10-0894, 2011 WL 237969, at *4 (Iowa Ct. App. Jan. 20, 2011) (citing *In re Marriage of Fall*, 593 N.W.2d 164, 167 (Iowa Ct. App. 1999). Scrutinizing the overall property division, we find that Amy is left with ample assets through which she can fund her retirement. She generates significant income through the Rein Center, which Laurie helped to establish. In context, the district court's allocation of retirement assets was equitable.

### C. Appellate Attorney Fees

Both parties request appellate attorney fees. "An award of appellate attorney fees is not a matter of right but rests in this court's discretion." *In re Marriage of Kisting*, 6 N.W.3d 326, 338 (Iowa Ct. App. 2024). We consider the parties' respective abilities to pay, the merits of their positions, and whether a party was required to defend the district court's decision on appeal. *Id.* We recognize that Laurie had to defend the court's property division on appeal and prevailed in doing so. But she and Amy take comparable salaries from their businesses, and Laurie is receiving a significant equalization payment from Amy. Weighing those factors, we decline to award appellate attorney fees.

**AFFIRMED.**